GREGORY M. SALVATO (SBN 126285)
    Gsalvato@salvatoboufadel.com
JOSEPH BOUFADEL (SBN 267312)
    Jboufadel@salvatoboufadel.com
SALVATO BOUFADEL LLP
777 South Figueroa Street, Suite 2800
Los Angeles, California 90017-5826
Telephone: (213) 484-8400

Proposed Attorneys for Debtor-in-Possession
ADVANCED SLEEP MEDICINE SERVICES, INC.,
a California corporation

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY

| | |
|---|---|
| In re:<br><br>ADVANCED SLEEP MEDICINE SERVICES, INC.,<br>a California corporation,<br><br>              Debtor. | Case No. 1:21-bk-10396-VK<br><br>Chapter 11 (Subchapter V election)<br><br>**Declaration of Kermit Newman, CEO of Debtor, in support of First Day Motions**<br><br><br>Hearing:<br>Date:    TBD<br>Time:<br>Place:   Courtroom 301<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367 |

Salvato Boufadel LLP

Declaration of Kermit Newman in Support of First          -1-          *In re Advanced Sleep Medicine Services, Inc.*
Day Motions                                                                         Chapter 11 Case No. 1:21-bk-10396-VK

## DECLARATION OF KERMIT NEWMAN

I, Kermit Newman, declare as follows:

1.      I am the President and Chief Executive Officer of Advanced Sleep Medicine Services, Inc. ("ASMS"), debtor and debtor in possession in the above captioned chapter 11 proceeding.  I am the officer with primary responsibility for the business and financial affairs of ASMS. I am familiar with ASMS's operations and its books and records, which I personally know are made and maintained in the ordinary course of business. On this basis, I have personal knowledge of the facts stated herein or knowledge based on the business records that are made and maintained in ASMS's ordinary course of business, the information supplied to me by (a) my colleagues who report directly to me or (b) ASMS' general bankruptcy counsel and other legal and professional advisors.

2.      I submit this Declaration to provide the Court and all parties in interest with an overview of ASMS, its business, and the events precipitating the commencement of ASMS's chapter 11 case (the "Case"). This Declaration is also submitted in support of the Debtor's voluntary petition and First Day Motions (defined herein). If asked to do so, I could and would testify competently under oath to the following matters.

3.      On the date of this Declaration (the "Petition Date"), ASMS filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "Court"). ASMS commenced its Case to effectuate a comprehensive restructuring of its capital structure and business operations.  ASMS continues to operate its business as a debtor and debtor in possession under the Bankruptcy Code.

## Background and Personal Knowledge

4.      I joined ASMS as CEO and a member of the Board of Directors in September 2013.  Prior to joining ASMS I worked as the Chief Operating Officer and Chief Financial Officer at Marina Del Rey Hospital for about 3 ½ years with broad responsibilities including contract negotiation, cost reduction, electronic medical record

Salvato Boufadel
LLP

Declaration of Kermit Newman in Support of First
Day Motions                                    -2-                    In re Advanced Sleep Medicine Services, Inc.
Chapter 11 Case No. 1:21-bk-10396-VK

1  implementation and construction of new operating rooms and renovation of the hospital

2  lobby and surgical recovery wing, as well as operating activities including admitting,

3  billing and collections, housekeeping and food service. Before Marina Del Rey Hospital, I

4  was the Chief Financial Officer for Lakeside Medical Group in Los Angeles for about 15

5  years and helped grow the company significantly, develop the employed physician

6  medical group and acquire the company's Knox-Keene license.  I have worked for almost

7  my entire professional career in the management of healthcare in California.  I hold a

8  California Certified Public Accountant (CPA) license (inactive).   I earned an M.B.A.

9  degree from the Anderson Graduate School of Management at UCLA and a Bachelor's

10  degree from Stanford University.

11  **Description of ASMS's Business**

12  5.    I provide this Declaration on behalf of ASMS to describe ASMS's business

13  and as its "statement of operations" as required under sections 1187(a), 1116(1)(A), and

14  1116(1)(B) of the Bankruptcy Code.

15  6.    In accordance with the sections 1187(a), and 1116(1) of the Bankruptcy

16  Code, I have attached hereto the following:

17  **Exhibit 1** – ASMS's most recent balance sheet and income statement (statement of

18  operations);

19  **Exhibit 2** – ASMS's most recent cash flow statement); and

20  **Exhibit 3** – ASMS's most recent consolidated federal income tax return (2019).

21  7.    ASMS helps physicians and patients diagnose and treat sleep disorders,

22  including sleep apnea. Generally:

23  a.    ASMS provides overnight sleep studies, home sleep apnea tests,

24  therapeutic devices including PAP machines (positive airway pressure) and PAP supplies.

25  In 2019 ASMS conducted more than 25,000 diagnostic tests at 21 clinic locations

26  throughout Southern California.

27  b.    For overnight sleep studies, the patient comes to one of the ASMS

28  clinic locations.  The clinics are generally located in a medical office building with rooms

Salvato Boufadel
LLP

1   set up as bedrooms.  The patient comes to the clinic about 9:00 pm and stays overnight.

2   The sleep technician attaches soft electrodes to the patient's scalp, face, arms, legs and

3   torso to record brainwaves, breathing, blood oxygen levels and other measures.  While the

4   patient is sleeping the technician monitors the patient from another room.  After the study,

5   a scoring technician performs a data quality review and summarizes the data.  A physician

6   then interprets the data and makes a diagnosis and recommendations.  The final report is

7   sent back to the referring physician, who discusses the results with the patient and makes a

8   treatment plan.

9          c.      ASMS is not a professional corporation engaged in the practice of

10  medicine.  Rather, it is a regular C-corporation and is categorized as an Independent

11  Diagnostic Testing Facility.  We conduct studies based on a prescription from a referring

12  physician.

13         d.      Sleep apnea is a debilitating medical condition.  In obstructive sleep

14  apnea, the most common variant, the patient's airway relaxes and collapses during sleep

15  preventing the flow of air to the lungs and causing the patient's brain to awaken.  Each

16  apnea event by definition lasts 10 seconds or longer, during which time the patient is

17  unable to breathe, until the patient's brain awakens sufficiently to cause the patient to start

18  breathing again, typically with a gasp and snort or rush of air.  In mild sleep apnea, the

19  patient awakens between 5 and 15 times per hour, in moderate sleep apnea between 15

20  and 30 times per hour and for severe sleep apnea, more than 30 times per hour.  The

21  constant awakenings fragment sleep and prevent deep sleep.

22         e.      Sleep apnea can cause excessive daytime sleeping that lowers the

23  quality of life and affects relationships, hinders work performance and can create

24  dangerous situations such as impaired driving.  Sleep apnea causes snoring that can harm

25  relationships and subject the patient to ridicule.  Sleep apnea and obesity can create a

26  vicious cycle; sleep apnea can contribute to obesity due to low energy, daytime sleepiness

27  and apathy, and obesity in turn is a risk factor for sleep apnea.  Sleep apnea is linked to

28

Salvato Boufadel
LLP

Declaration of Kermit Newman in Support of First        -4-        *In re Advanced Sleep Medicine Services, Inc.*
Day Motions                                                                   Chapter 11 Case No. 1:21-bk-10396-VK

1  serious health conditions including heart disease, heart failure and heart attack,

2  hypertension, stroke and diabetes.

3        f.      PAP therapy and other therapeutic options can be effective in treating

4  sleep apnea.  For many patients, PAP devices all but eliminate sleep apnea during use.

5  PAP devices are non-surgical and non-pharmacological with a high success rate.

6        g.      ASMS was founded in 1994 by a physician who is a sleep specialist

7  and a pioneer in sleep medicine.  By 2010 ASMS had approximately eight locations in

8  Southern California and a private equity group acquired majority ownership with the

9  intention of growing the company and extending services throughout California.  I joined

10  the company as CEO in September 2013 and during my tenure we grew from 14,000

11  diagnostic tests in 2012 to 25,000 in 2019.  Revenue grew from less than $9 million to

12  over $14 million.  We generated EBITDA (Earnings Before Interest, Tax, Depreciation

13  and Amortization) averaging over $1 million per year from 2013 to 2019.  By early 2020

14  ASMS had grown to 21 locations, mostly through organic growth, and the Board of

15  Directors and management began planning for the potential sale of the company and exit

16  for the private equity group in 2021.

17        h.      ASMS provides excellent medical care and customer service.  ASMS

18  has more than 1,500 patient reviews on Google and an average rating of 4.6 stars out of 5.

19        i.      ASMS fulfills a critical function in the healthcare system in Southern

20  California and holds contracts with nearly all managed care payers including large

21  physician groups.  Unlike many healthcare providers, ASMS provides services to Medi-

22  Cal (Medicaid) patients as well as patients with Medicare, HMO or PPO insurance.

23  About one-third of ASMS's patients have Medi-Cal insurance.

## Circumstances Leading to ASMS's Chapter 11 Filing

25        8.      The events precipitating the Debtor's case are now a familiar story.  The

26  global coronavirus pandemic drastically affected the Debtor's operations.  The economic

27  impact resulted in a drop in patient revenue from more than $14 million in 2019 to less

28  than $9 million in 2020.  Ultimately, the pressure from unpaid landlords, threatened and

Salvato Boufadel
LLP

Declaration of Kermit Newman in Support of First
Day Motions      -5-      *In re Advanced Sleep Medicine Services, Inc.*
Chapter 11 Case No. 1:21-bk-10396-VK

1    actual commencement of litigation, and relentless demands for payment have necessitated

2    that ASMS and ASMS Holding Company seek bankruptcy relief.

3         9.     On March 19, 2020 California Governor Gavin Newsom and Los Angeles

4    City Mayor Eric Garcetti each issued emergency "safer at home" orders.  While exempt

5    from the orders as a health care provider, the Debtor determined it was in the best interest

6    of its patients and staff to temporarily shut down its diagnostic operations in order to more

7    fully assess the COVID risk.  Accordingly, ASMS temporarily shut down its main

8    activity, overnight sleep studies, from March 21, 2020 to May 5, 2020 and shut down its

9    home sleep test activity from March 21, 2020 to April 15, 2020.

10         10.     During the temporary shutdown ASMS, led by its chief medical officer,

11    reviewed its procedures in light of the pandemic.  Based on this review, ASMS resumed

12    overnight sleep studies on May 5, 2020 for polysomnography only, excluding PAP

13    titration studies.

14         11.     Approximately 50% of ASMS's overnight sleep studies prior to the

15    pandemic were PAP titration studies where the technician fits a PAP device to the patient

16    during the night of sleep.  The PAP device blows air into the patient's airway to maintain

17    a positive pressure and keep the airway open so the patient can breathe, and during the

18    study the technician calibrates or "titrates" the device to find the lowest pressure that is

19    effective in eliminating the apneas.  Use of a PAP device during testing may increase the

20    risk of covid transmission since the device blows air into the patient's airway and can

21    spread air throughout the room increasing the risk of transmission if the virus is present.

22    At the time, the American Academy of Sleep Medicine recommended that sleep centers

23    conduct titration studies only when required based on the patient's condition.  From May

24    5, 2020 to June 23, 2020 ASMS did not conduct titration studies.  Beginning June 24,

25    2020 ASMS resumed titration studies, but only when the patient was able to present a

26    negative covid test completed within 72 hours (later extended to 7 days) prior to the

27    beginning of the sleep study.  Due to the difficulty in a patient getting a COVID test as

Salvato Boufadel
LLP

28

Declaration of Kermit Newman in Support of First    -6-    *In re Advanced Sleep Medicine Services, Inc.*
Day Motions    Chapter 11 Case No. 1:21-bk-10396-VK

1   well as the administrative hurdles to getting the COVID test done within the required

2   timeframe prior to the sleep study, ASMS conducted sharply fewer titration studies.

3        12.    In addition, patients showed a greater hesitancy to attend their scheduled

4   sleep studies during the pandemic than before, with the patient no-show and same day

5   cancellation rate doubling from about 10% prior to the pandemic to 20% or 25% during

6   the pandemic.  In addition to reducing volume, the patient no-shows and same day

7   cancellations increased expense since ASMS incurred all the customer service,

8   scheduling, facility and similar expenses prior to the study and scheduled the sleep

9   technician for the service without knowing until the time of the study whether the patient

10  would keep the appointment.  ASMS confirmed appointments with patients multiple times

11  using live telephone calls and text messages but was not able to significantly reduce the

12  no-show and same day cancellation rate.  Under its payer contracts ASMS generally

13  cannot charge patients a no-show fee.

14       13.    Overall, ASMS conducted only 40% to 50% of its prior sleep study volume

15  during the pandemic.

16       14.    ASMS received payments under the CARES Act Provider Relief Fund of

17  $86,145 on April 10, 2020 and $240,922 on June 19, 2020.  ASMS was not eligible for

18  loans under the Paycheck Protection Program since it was at that time owned by a private

19  equity group and on a consolidated basis the private equity group and its portfolio

20  companies did not qualify.  On November 4, 2020 ASMS applied for additional funding

21  under Round 3 of the Provider Relief Fund.  ASMS provided financial information

22  showing that patient revenue had dropped from $7.6 million in the first half of 2019 to

23  $4.6 million in the first half of 2020.  ASMS did not request a specific funding amount

24  and the application did not provide any indication as to what amount of funding would be

25  provided.  ASMS management researched the size and procedures for the Round 3

26  funding in order to estimate the potential award to ASMS and when an award might be

27  made but found only very limited information.  Based on the limited information, ASMS

Salvato Boufadel
LLP

28

1   management estimated at the time that the Round 3 funding might be approximately

2   $20,000 and made no estimate regarding timing.

3        15.    ASMS has loan agreements with FirstBank, based in Nashville, Tennessee,

4   who is the primary lender ("<u>FirstBank</u>").  ASMS' parent, ASMS Holding Company, is a

5   guarantor to the loans.  The loans are secured by all the assets of ASMS and ASMS

6   Holding Company.  There is a term loan and a revolving line of credit with the maximum

7   borrowing amount tied to the ASMS patient receivables.  On April 29, 2020, ASMS and

8   FirstBank amended the ASMS loans to defer principal and interest payments for April,

9   May and June of 2020.  On August 6, 2020 ASMS notified FirstBank that ASMS was out

10   of compliance with one of the bank covenants as of June 30, 2020.

11        16.    On September 23, 2020 ASMS suffered a ransomware attack that encrypted

12   the files of many of the computers used to conduct sleep studies and rendered the ASMS

13   network unusable.  The ransomware attack itself was covered by insurance and was

14   partially resolved after about three weeks when we were able to unlock some of the

15   computer files and restore the network.  Prior to the resolution, ASMS was able to limit

16   the amount of lost business by reallocating unaffected computers to the affected locations

17   and using a manual process to record and transmit the sleep studies rather than the

18   automatic network-based process used previously.  The ASMS technical leadership team

19   and ASMS technical staff worked long hours during this period and utilized their energy,

20   expertise and ingenuity to restore and maintain services for patients.  ASMS experienced

21   higher expense in conducting the sleep studies, in completing the scoring and physician

22   interpretation for the studies and in restoring the computers and network.

23        17.    The ransomware attack caused ASMS to develop a large backlog in sleep

24   studies where patients had undergone the study but ASMS had not yet completed the

25   scoring or physician interpretation functions or provided the final report to the referring

26   physician.  At its maximum in early November 2020, the backlog was approximately

27   1,137 patients.  The backlog reflected the serious ongoing operational difficulties caused

28   by the ransomware attack, that ASMS overcame only gradually.  In addition, the backlog

Salvato Boufadel
LLP

1  caused a delay in billing for services.  The billing delay, layered onto the low volume and

2  higher expense caused by the pandemic and ransomware attack, created a cash shortfall.

3      18.    Throughout this period, ASMS took all the actions it could to improve its

4  financial prospects.  ASMS closed seven of 21 clinic locations, requested and received

5  rent deferrals and waivers, renegotiated vendor and physician contracts, extended vendor

6  payment terms and sharply reduced staffing.  ASMS also moved forward with prior plans

7  to reduce expense by outsourcing some services and vacating the corporate office.  Board

8  members and senior management held weekly telephonic meetings to receive updates,

9  monitor cash and expenditures and plan strategy.

10      19.    In October 2020 ASMS approached the maximum of its line of credit.

11  Management, working with board members and the private equity group, prepared a

12  detailed forecast that showed ASMS exceeding the credit maximum by the end of the

13  month on October 31, 2020.  Even under aggressive assumptions the forecast showed the

14  cash shortfall worsening throughout the first half of 2021 to a borrowing need of $1.9

15  million by June 30, 2021.

16      20.    If ASMS exceeded the credit maximum and was not able to reach an

17  agreement with FirstBank for additional credit, FirstBank might stop clearing the ASMS

18  checks.  ASMS would have no access to cash and would experience an uncontrolled

19  shutdown.

20      21.    The Board of Directors was particularly mindful of important obligations

21  including the need to pay employees for services rendered, to complete the 1,137 sleep

22  studies in process and return results to the referring physicians and patients, to provide

23  patients and physicians with access to medical records going forward and to secure all

24  patient data preventing any unauthorized disclosure.  At a special meeting on November

25  6, 2020, the Board of Directors reviewed all strategic options, including obtaining

26  additional bank loans to fund operations, finding a rescue buyer, exploring a radical

27  restructuring of the business and working with the Bank as the secured creditor to

28  liquidate the business and maximize loan recovery.

Salvato Boufadel
LLP

22.     On November 6, 2020, FirstBank notified ASMS that the amount due on the line of credit had exceeded the credit maximum and that FirstBank would honor the items that had been presented up to the current date but would not agree to allow ASMS to exceed the credit maximum going forward.  FirstBank also gave ASMS a Notice of Default and Reservation of Rights including formal notice that FirstBank would not agree to allow ASMS to exceed the credit maximum on the line of credit.

23.     On November 9, 2020, FirstBank and ASMS met telephonically.  ASMS proposed a "soft liquidation" under which ASMS would wind down the business in a controlled manner.  ASMS would pay employees all amounts due, complete and bill for the 1,137 sleep studies in process, place medical records with a custodian for access by patients and physicians going forward and secure all patient data preventing any unauthorized disclosure.  ASMS would also continue to collect accounts receivable.  The soft liquidation scenario showed higher recovery than the immediate shutdown option due to the additional revenue from completing and billing for the 1,137 sleep studies in process plus the continued collection of the accounts receivable partially offset by higher recovery expenses.  FirstBank informally indicated its willingness to consider the soft liquidation approach.

24.     On November 12, 2020, the ASMS Board of Directors voted unanimously to liquidate the business and maximize loan recovery.

25.     On November 13, 2020, ASMS announced the closure of the business and notified all patients scheduled for services that their appointments were cancelled.  ASMS immediately laid off 67 out of 89 employees.  ASMS provided notice to the remaining 22 employees that they would be laid off effective December 11, 2020 or earlier, later extended to December 30 for some employees.  ASMS retained the 22 employees to complete sleep studies in process including the backlog of studies requiring scoring and physician interpretation, to wind down operations, and to bill and collect the accounts receivable.  On November 25, 2020 ASMS also notified referring physicians and insurance companies that it had stopped accepting new patients.

Salvato Boufadel
LLP

26.     Due to the reduction in business activity, ASMS recorded a sharp loss in the value of its assets in its November 2020 financial statements, in accordance with generally accepted accounting principles.  The losses recognized include valuing supplies, inventory and equipment at liquidation value rather than historical cost, writing off tenant improvements at closed facilities, and impairment of goodwill and other assets.

27.     Following the November 13, 2020 announcement, ASMS, in consultation with its financial advisors and in coordination with FirstBank, began to implement the "soft liquidation" and closure of its facilities.

### Receipt of the Round 3 CARES Act Provider Relief Funds

28.     One month after ASMS had shut down its operations, in a surprising development, on December 16, 2020, ASMS received $807,099 under Round 3 of the CARES Act Provider Relief Fund.  The amount was much larger than ASMS management or the Board of Directors had anticipated.  ASMS management had earlier estimated the Round 3 Provider Relief Funds award might be approximately $20,000, so the actual award of $807,099 was much larger than expected.

29.     Under the program's terms and conditions, the Provider Relief Funds can be used only for the provision of patient care or to make up revenue lost due to the pandemic or be returned.  Under the program's terms and conditions, the funds cannot be used to satisfy obligations in a bankruptcy proceeding.  The Provider Relief Funds are not subject to the lien of the Debtor's major secured creditor, FirstBank.  Accordingly, ASMS has recorded the Provider Relief Funds as restricted cash on its balance sheet.

30.     After consultation with business and bankruptcy counsel, ASMS evaluated its options (one of which was to return all Provider Relief Funds). Ultimately, we concluded that ASMS would qualify as a small business debtor under Subchapter V of Chapter 11 of the Bankruptcy Code and that there existed a strong probability of a successful Chapter 11 reorganization.

Salvato Boufadel
LLP

1    31.    The receipt of the Provider Relief Funds makes it possible for ASMS to

2    continue serving patients in a Chapter 11 framework while it re-builds and re-grows its

3    business.

4    32.    The Provider Relief Fund was intended to strengthen the provider network

5    and to ensure the ongoing provision of care to patients.  ASMS's intended utilization of

6    the Provider Relief Funds to continue and restart its operations exactly matches the

7    purpose of the Provider Relief Fund. Use of the Provider Relief Funds to maintain and

8    operate ASMS while it re-builds its business is in accordance with Congress' stated public

9    policy in enacting the Provider Relief Fund and implements the precise purpose for which

10    the funds are intended.

11    **Corporate Structure**

12    33.    The Debtor is Advanced Sleep Medicine Services, Inc., a California C-

13    corporation.

14    34.    ASMS is wholly-owned by ASMS Holding Company, Inc. ASMS Holding

15    Company has no business operations, employees or bank accounts.  Its sole function is to

16    hold the issued and outstanding shares in ASMS, which it has pledged to ASMS's lender,

17    FirstBank.  ASMS Holding Company files consolidated tax returns with ASMS and, with

18    ASMS, operates as a unified business enterprise.

19    35.    ASMS intends to file a joint plan of reorganization with AMS Holding

20    Company, and is evaluating whether to maintain its existing holding company structure in

21    its plan of reorganization.

22    **Shareholders and Board of Directors**

23    36.    The owner of all shares of ASMS is ASMS Holding Company.  I (Kermit

24    Newman) as an individual am the owner of all shares of ASMS Holding Company.  As

25    such, I am the sole member of the Board of Directors of both ASMS and ASMS Holding

26    Company.

27    37.    I acquired 91% of the outstanding shares of ASMS Holding Company on

28    January 13, 2021 by purchase for $1.00 from the private equity group, and an additional

Salvato Boufadel
LLP

7% on January 31, 2021 for $1.00 by purchase from the original founder of ASMS who also served as a member of the Board of Directors through the date of the sale. The private equity group and the original founder also agreed to waive amounts due from ASMS under a management services agreement and professional services agreement, respectively. The sellers are sophisticated investors and had full knowledge of ASMS's business including the receipt of the Provider Relief Funds as well as my intention to explore the potential of a Chapter 11 reorganization. There were four other equity holders plus me, each with less than 0.5% of the total stock outstanding. The stockholder agreement included a "drag along" provision and I acquired the remaining stock under this provision effective February 5, 2021.

38.     All the ASMS owners except me (thus far) as the current owner suffered a total loss of their investment. The value of my ownership is entirely speculative and dependent on future effort and circumstances, as evidenced by the willingness of the private equity group, a sophisticated investor with full information and under no duress, to sell its interest for a nominal amount.

### Capital Structure

39.     As of the Petition Date, ASMS had total assets of approximately $1,491,000 on a net book basis. ASMS' assets include the $807,099 received from and restricted under the CARES Act Provider Relief Fund, $332,092 in cash, $17,000 in patient accounts receivable and $57,000 in equipment and furnishings.  ASMS' current liabilities totaled approximately $3,504,503 as of Petition Date including the loans listed below, income tax payable of $36,100, deferred payroll taxes of $135,642, vendor payables of $987,383, current rent payable of $322,030 and capital lease payable of $38,336.

40.     The following loans are outstanding:

a.     Term loan at FirstBank, Nashville, Tennessee: $1,118,750.07

b.     Revolving line of credit at FirstBank, Nashville, Tennessee: $788,283.50.

Salvato Boufadel
LLP

**Other Obligations**

41.    Lease Obligations.  ASMS has substantial residual lease obligations arising from its occupancy of 16 separate facilities. ASMS has been engaged in substantive negotiations with numerous landlords and intends to reject the majority of the existing leases as of the Petition Date.  A review of outstanding lease obligations is ongoing.

42.    Trade Creditors. As of the Petition Date, ASMS's outstanding liabilities to trade creditors totaled approximately $987,383.

43.    Equipment Leases. There are a two equipment leases near the end of the lease term, with balances of $11,575 and $26,761. ASMS plans to assume these leases.

44.    Employees. As of the Petition Date, ASMS has no employees and does not owe any amounts to former employees.  ASMS laid off most of its employees on November 13, 2020, and the remainder by December 30, 2020.  ASMS paid all wages and accrued vacation to each employee on the employee's termination date and provided benefits in accordance with ASMS's policies and employment arrangements.

45.    Individuals providing services as independent contractors.  The Debtor contracted with individuals as independent contractors to provide services initially to wind down the business operations.  Following receipt of the CARES Act Provider Relief Fund money, the individuals have also provided services to a limited extent to restart business operations.  ASMS will convert the independent contractors to employees as soon as possible.  The individuals under contract are: Kermit Newman, CEO; Brian Vermilion (through March 19, 2021), daytime technical manager with responsibilities for technical operations including vacating leased locations; Elizabeth Bilbo, customer service manager with responsibility for administrative operations; Adriana Navarro, human resources manager with responsibility for administrative operations; and Siamak Maghoul, information technology specialist.  In addition, ASMS has contracted with Robert Half International for the accounting services of David Landen to prepare financial statements and other schedules including the list of creditors.

Salvato Boufadel
LLP

46.  <u>Deferred payroll tax.</u>  ASMS deferred payment of the employer portion of payroll taxes in 2020 in accordance with the CARES Act in the amount of $135,642.

47.  <u>Wind-down of the ASMS 401k plan.</u>  ASMS terminated its 401k plan effective December 31, 2020, but still needs to complete its 2019 and 2020 plan audits, to amend its 2019 5500 filing to include the 2019 plan audit, to file the 2020 5500 filing including the 2020 plan audit, and to complete required notices to participants regarding the wind-down.  ASMS has contracted with a 401k auditor and a third-party administrator and paid retainers to cover these services.

48.  <u>Pending litigation.</u>  ASMS is the subject of several pending litigations, including unlawful detainer actions resulting from unpaid lease obligations. There is also a lawsuit in the Utah County District Court, Utah, involving an alleged contract dispute.

**Retention of Bankruptcy Counsel**

49.  ASMS has retained Salvato Boufadel, LLP as its general bankruptcy counsel for all bankruptcy matters, for which firm an application to employ will be submitted shortly.  ASMS also seeks to retain its longtime corporate counsel, Baer, Negrin & Troff, LLP, as special corporate counsel, whose primary responsibility will be to assist with the negotiations with FirstBank and with the landlords whose leases ASMS is seeking to assume. ASMS will work to ensure that there is no duplication of services, while seeking to gain the benefit of the prior knowledge and expertise of its existing counsel. For reasons explained in the employment applications, ASMS and ASMS Holding Company seek retention of common bankruptcy and corporate counsel, and believe that there is no disqualifying conflict of interest inherent in the joint representation.

**Patient Care Ombudsman**

50.  ASMS is a "health care business" within the meaning of 11 U.S.C. § 101(27A).  Accordingly, ASMS understands that the appointment of a patient care ombudsman ("<u>PCO</u>") within thirty (30) days of the commencement of this case is

Salvato Boufadel LLP

1    mandatory pursuant to 11 U.S.C. § 333, unless a debtor seeks excuse from this

2    requirement.  ASMS does *not* intend to seek relief from this requirement.

3    **Cash Collateral and Use of Provider Relief Funds**

4    51.    ASMS's primary lender is FirstBank, successor by merger to Franklin

5    Synergy Bank, a Tennessee banking corporation ("FirstBank"), whose main office is in

6    Lexington, Tennessee.  As of this date, ASMS intends to fund its operations, to the extent

7    possible, without use of the cash collateral of its primary lender, FirstBank.  FirstBank has

8    a security interest in ASMS's pre-petition accounts receivable, which will be segregated

9    and collected in a segregated bank account. By statute, and as acknowledged by First

10    Bank, FirstBank does not have a security interest in any of the Provider Relief Funds,

11    which can only be used for current operations and not for the payment of bankruptcy debt.

12    52.    The Provider Relief Funds received by ASMS comes with certain stringent

13    conditions. If the terms and conditions are met, then the funds received do not need to be

14    repaid. Specifically, the CARES Act provisions provide that:

15    *Payments from the Provider Relief Fund shall not be subject to the claims of the*

16    *provider's creditors and providers are limited in their ability to transfer Provider*

17    *Relief Fund payments to their creditors.  A provider may utilize Provider Relief*

18    *Fund payments to satisfy creditors' claims, but only to the extent that such claims*

19    *constitute eligible health care related expenses and lost revenues attributable to*

20    *coronavirus and are made to prevent, prepare for, and respond to coronavirus, as*

21    *set forth under the Terms and Conditions.*

22    53.    Accordingly, it is ASMS's intent to comply fully with the Terms and

23    Conditions of the CARES Act with respect to provider Relief Funds and to utilize such

24    funds only for the intended purposes, the continued operation of ASMS to enable it to

25    provide health services.

26    **Facts in Support of First Day Motions**

27    54.    Contemporaneously with this Declaration, the Debtor has filed or expects to

28    file a number of pleadings (the "First Day Motions") seeking orders granting various

Salvato Boufadel
LLP

forms of relief intended to stabilize ASMS's business, facilitate the efficient

administration of this chapter 11 case, lessen the impact of the chapter 11 case on ASMS's

day-to-day operations and employees, and facilitate a successful reorganization of ASMS.

I believe that this Court's approval of the relief requested in the First Day Motions is

essential to avoid immediate and irreparable harm to ASMS and its estate, to provide

ASMS with an opportunity to continue to meet its obligations in the ordinary course of

business, to provide for a smooth transition into chapter 11 and to provide for the efficient

and swift administration of this chapter 11 case. A description of the relief requested, and

the facts supporting each of the First Day Pleadings, is briefly set forth below.

55.     By the First Day Pleadings, ASMS requests, among other things, that the

Court:

    a.   Authorize the joint administration of the ASMS bankruptcy case with that of
the Holding Company bankruptcy case;

    b.   Authorize the continued use of existing ASMS's bank accounts;

    c.   Permit the immediate rejection of leases;

    d.   Authorize the maintenance of existing utility deposits;

    e.   Set a claims filing deadline ("Bar Date").

56.     I believe that the relief requested in each First Day Pleading: (a) is necessary

to preserve and maximize the value of ASMS's estates; (b) is essential to the successful

reorganization of ASMS; and (c) serves the best interests of ASMS, its estate, creditors,

and all other parties in interest.

**A. Motion for Joint Administration**

57.     Simultaneously with ASMS's filing, I have authorized a Chapter 11

bankruptcy filing by ASMS's sole shareholder, ASMS Holding Company ("ASMS

Holding").  ASMS Holding has no current business operations other than its ownership of

ASMS.  It has no employees, bank accounts or unrelated business activity.  Its sole

function is to hold all of the issued and outstanding shares in ASMS. ASMS Holding files

consolidated tax returns with ASMS, its sole subsidiary. I am the sole shareholder and

Salvato Boufadel
LLP

Declaration of Kermit Newman in Support of First
Day Motions
-17-
In re Advanced Sleep Medicine Services, Inc.
Chapter 11 Case No. 1:21-bk-10396-VK

1   officer and board member of ASMS Holding as well as the sole officer and board member

2   of ASMS.

3        58.    ASMS Holding has a single creditor, FirstBank, to which it has pledged all

4   of its stock in ASMS to support its guaranty of the debt to FirstBank owed by ASMS.

5   FirstBank is, of course, a creditor of ASMS and the only creditor in common between the

6   two entities.

7        59.    I believe that joint administration of this case with that of ASMS Holding is

8   warranted in this circumstance.  ASMS and ASMS Holding seek joint administration as it

9   will simplify these cases, lessen the administrative burden for the Court and the parties,

10  while ensuring that the creditors of the different estates are protected from potential

11  conflicts of interest.

12  **B. Motion to Maintain Existing Cash Management System**

13       60.    Debtor currently has a total of four bank accounts, all of which serve or

14  have served as collection or operating accounts and are held only in the names of

15  Advanced Sleep Medicine Services, Inc. ASMS Holding Company does not have a bank

16  account.

17       61.    ASMS's bank accounts are maintained at FirstBank and Wells Fargo Bank

18  and consist of the following:

19           a.    <u>Collection Account x8479</u> (FirstBank) – Used for all deposits except

20  Medicare deposits.

21           b.    <u>Collection Account x4549 – Medicare (Wells Fargo Bank)</u> – Used

22  for Medicare deposits.

23           c.    <u>Disbursement Account x8461 (First Bank)</u> – Used for all

24  disbursements except payroll and related disbursements.

25           d.    <u>Payroll / Tax Account x685 (FirstBank)</u> – Used for payroll and

26  related disbursements.

27       62.    Upon the bankruptcy filing, ASMS intends to open three debtor-in-

28  possession accounts for disbursements at Wells Fargo Bank, an approved depository.  One

Salvato Boufadel
LLP

account will serve as a collection account, into which all Provider Relief Funds will be transferred. The second will be for cash collateral of FirstBank, and the third for payroll and related disbursements. ASMS seeks leave of the Court to maintain its two existing pre-petition collection accounts, the Collection Account at FirstBank, and the Collection Account – Medicare at Wells Fargo. Receipts into these two accounts will be swept into the Debtor in Possession General Operating Account or the Debtor in Possession Cash Collateral Account on at least a weekly basis.

63.     ASMS currently has direct transfer relationships with approximately 150 entities and vendors and governmental agencies for payment of patient services. Closing these accounts at this time will cause tremendous and harmful disruption to ASMS's business and interrupt needed cash flow.

64.     It is extremely important for ASMS to maintain its existing cash management system because of the difficulty and arduous process of transferring those accounts which could each take several months. Accordingly, ASMS seeks an Order authorizing it to maintain all existing accounts, with the exception of the three new Debtor in Possession Accounts.

**C. Motion to Reject Non-Residential Leases**

65.     Debtor is the lessee under a total of 16 unexpired subleases of nonresidential real property, with $457,287 due under leases as of February 28, 2021 and an additional $1,041,076 due from March 1, 2021 through the scheduled end of the leases.

66.     ASMS's facilities at each of the premises described in the Leases subject to rejection (collectively, the "Facility Locations") have been unprofitable for the past year, during the COVID Pandemic. ASMS has analyzed the losses that it has suffered at these unprofitable Business Locations and determined in its business judgment, to reduce or eliminate them. ASMS intends to reject a total of 15 leases and other executory contracts as of the Petition Date.

Salvato Boufadel
LLP

67.     Attached to the Lease Rejection Motion is a schedule of Leases to be rejected as of the Petition Date and schedule of Executory Contracts to be rejected as of the Petition Date.

68.     ASMS already has vacated or promptly will vacate the premises described in the Leases and is in the process of making arrangements with the contracting parties to return to it the personal property. Since all rents accruing under the Leases after the Petition Date may be entitled to administrative priority, and these rents relate to Facility Locations that either are unprofitable or have never been operational, ASMS must immediately reject these Leases.

69.     The Leases are no longer of value and constitute a burden on ASMS's bankruptcy estate. ASMS no longer operates the Locations. Therefore, rejection of the Leases will give ASMS access to increased cash flow and, therefore, is in the best interests of ASMS's estate.

70.     The Lease and Contract Rejection Procedure proposed in the Motion sets forth a mechanism by which ASMS will provide to each contracting party and the Subchapter V Trustee notice of the proposed rejection and an opportunity to object to such rejection. Thus, implementation of the Lease and Contract Rejection Procedure will not prejudice any contracting party; indeed, the proposed procedure will result in administrative efficiency.  I believe that Court authorization to implement the Lease Contract Rejection Procedure is in the best interests of the estates and judicial economy and will minimize administrative expenses and burdens on the Court.

**D.  Motion to Maintain Utility Deposits**

71.     As previously noted, ASMS leases and operates sixteen facilities throughout Southern California. ASMS has vacated or intends to immediately vacate ten of the facilities, continuing to operate in six (6) locations as of the Petition date.  TASMS's utility-related obligations are owed to a number of different utility providers ("Utilities"), although several utility providers deliver services to a number of the Leased Properties. ASMS

Salvato Boufadel
LLP

72.     Most of the utility services to ASMS are provided by the landlord for each Facility whose contract with the Utilities is not anticipated to be impacted by ASMS's bankruptcy filing.  However, as to those Utilities with a direct contractual relationship to ASMS, relief is sought to ensure that those contractual relationships are not interrupted or terminated as a result of the bankruptcy.

73.     Continued provision of utility services is critical to ASMS's operations. The offices need electricity, gas and phone and internet service to keep the facilities running. Without the ability to keep ASMS's facilities open during this process, ASMS's business operations would cease causing ASMS to lose its revenue stream, which would in turn harm its creditors.

74.     The relief requested in Utilities Motion is necessary and appropriate to ensure a smooth transition into ASMS's chapter 11 case, to normalize and maintain ASMS's operations during pendency of the Case, and to preserve and maximize value of ASMS's estates for the benefit of their creditors.

75.     If utility services at any of the offices was lost, then ASMS would not be able to operate its businesses, which would significantly reduce the assets available to its creditors. Given that ASMS is prepared to provide the Utilities with adequate assurance of payment in the form of a deposit in the amount of the estimated fourteen-day usage for each Utility based on the most recent Utility bills for each of the offices prior to ASMS's entry into bankruptcy, I believe the relief requested is necessary and appropriate under the circumstances.

**E.  Motion to Set Bar Date**

76.     Consistent with ASMS's desire to submit a Plan of Reorganization as soon as possible, ASMS seeks entry of an Order setting a bar date for the filing of all pre-petition claims, including Lease Rejection Claims, at the earliest possible date.

77.     Accordingly, ASMS has requested that the Court grant its Motion to Set Bar Date and set the bar date for claims for April 30, 2021, which is calculated to give all creditors and parties in interest approximately 45 days' notice of the claims filing

Salvato Boufadel
LLP

Declaration of Kermit Newman in Support of First
Day Motions                                   -21-                    In re Advanced Sleep Medicine Services, Inc.
                                                                                    Chapter 11 Case No. 1:21-bk-10396-VK

1  deadline. In the alternative, ASMS requests that the bar date be set at the earliest possible

2  date the deadline can be set.

3  **F. Conclusion.**

4       78.    I have reviewed each of the First Day Motions, the facts stated therein and

5  the descriptions of the relief they request. I believe the Orders requested are warranted.

6  Accordingly, I respectfully request that the Court grant the First Day Motions as in the

7  best interests of ASMS, the creditors and the bankruptcy estate.

8

9       I declare under penalty of perjury under the laws of the United States of America

10  that the foregoing statements are true and correct.

11       Executed on this 9th day of March 2021, at Encino, California.

12

13

14  _____

15       Kermit Newman

16

17

18

19

20

21

22

23

24

25

26

27

28

Salvato Boufadel
LLP

1    <u>Exhibits Attached to Declaration of Kermit Newman</u>:

2          **Exhibit 1** - Debtor's most recent balance sheet;

3          **Exhibit 2** - Debtor's most recent cash flow statement;

4          **Exhibit 3** - Debtor's most recent federal income tax return (2019).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Salvato Boufadel
LLP    28